HERBERT A. WHEELER, Respondent, v.
MATHEW T. CHESTNUT, Appellant.

St. Louis Court of Appeals, July 7, 1902.

1. **Contracts:** CONTINGENT PROMISE TO PAY: TESTIMONY:
EVIDENCE: WITNESS. The testimony of a purchaser of mining
lands, as to whether, in making the purchase, he was influenced
either directly or indirectly by a geologist's report thereon, which
he saw prior to his purchase, is admissible as being a matter within
the knowledge of the witness and not a mere conclusion.

2. **Striking out answer of witness:** ERROR. Where a purchaser
of mining lands, in answer to a direct question, testified that in
making the purchase he was not influenced by a certain geologist's
report, error in striking out such answer was not rendered harmless
by other testimony by him to the same effect, which was not
stricken out; the striking out of such answer being, in effect, a
condemnation of the similar testimony not stricken out.

3. ———: ———: INSTRUCTIONS: ERROR. H., having an option
on mineral land was endeavoring to sell it, and induced B. to fur-
nish money to put down drill holes, under an agreement to divide
profits in case of sale. Subsequently B. bought the land, at the
same time agreeing that if H. succeeded in selling it to others, he
might have a share of the profits of the resale. The original owner
had agreed to pay a geologist for a certain report on the land, pro-
vided such report aided in bringing about a sale; and after the sale
to B. the geologist sued such owner for the fee agreed upon. *Held*,
that an instruction on the issue as to whether the sale was induced
by the report, in which the names of H. and B. were coupled to-
gether as joint purchasers, was erroneous.

4. ———: ———: ———: ———. Where a purchaser of mineral
lands testified that in making the purchase he was not influenced
by a certain geological report, an instruction that the "opinion"
of the witness as to whether he was so influenced was not conclu-
sive, and that the jury might give such 'opinion" the weight to
which they deemed it entitled under all the circumstances in evi-
dence, was erroneous, as reducing the probative force of the testi-
mony to that of a mere opinion, thus depriving the jury of their
right to judge of its weight for themselves.

Wheeler v. Chestnut.

5. ——: ——: ——: ——. Defendant, an owner of mineral land, agreed to pay plaintiff, a geologist, for a report thereon, provided it aided directly or indirectly in a sale of the land. Thereafter, a party who had an option on the land induced another party to purchase it, the two agreeing at the same time that, if the former succeeded in selling it to others, he should share in the profits of the resale. It appeared further that the purchaser saw plaintiff's report before making the purchase. *Held*, that if the report was in the purchaser's mind when he made the purchase, and was regarded by him as a means through which a future sale might be aided, it would be deemed to have indirectly aided the sale to him.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

REVERSED AND REMANDED.

*Clinton Rowell* and *Joseph H. Zumbalen* for appellant.

(1) Plaintiff failed to make a prima facie case, there being neither proof that the sale was made through the direct or indirect aid of the report, nor of any facts from which that inference can be legitimately drawn. Chemical Co. v. Lackawana Line, 78 Mo. App. 312; Glick v. Railroad, 57 Mo. App. 104; Bigelow v. Railroad, 48 Mo. App. 367; Yarnell v. Railroad, 113 Mo. 580; Sanders v. Railroad, 147 Mo. 426. (2) It was error to refuse to permit Broderick, the purchaser of the property, to state whether or not he was influenced either directly or indirectly by the plaintiff's report, to purchase the property. Thatcher v. Phinney, 7 Allen 148; Cressler v. Rees, 27 Neb. 515; Reynolds v. Simpson, 74 Ga. 454; Law v. Scott, 5 Harr. & J. (Md.) 438. (3) The instruction numbered 2, given at plaintiff's request, should not have been given, as the matter it covers was not expert or opinion testimony. Rosentreter v. Brady, 63 Mo. App. 403; Hoyberg v. Henske, 153 Mo. 63. (a) It was error to give

it, because it was not based on any evidence in the case. (b) It was improper thus to single out by name the witnesses Broderick and Houseman. 2 Thompson on Trials, sec. 2421; State v. Meagher, 49 Mo. App. 589; State v. Stout, 31 Mo. 406; Mullins v. People, 110 Ill. 42; Shaver v. McCarthy, 110 Pa. St. 339. (c) It is a comment upon a particular fact, and that one not in evidence. (d) Said instruction was a direct attempt to discredit and impeach plaintiff's own witness (Broderick) for whose credibility he had vouched. Imhoff v. McArthur, 146 Mo. 371; State v. Burks, 132 Mo. 363; Dwyer v. Bassett, 63 Tex. 274.

*Judson & Green* for respondent.

(1) There was abundant evidence to take the case to the jury. Plaintiff's evidence clearly tended to show a sale of the property by the direct or indirect aid of plaintiff's report, and compelled a submission to the jury. Hodley v. Orchard, 77 Mo. App. 141; Thomas v. Pacific Express Co., 30 Mo. App. 86; Huck v. Doble, 76 Mo. App. 671. (2) It was not error to refuse to permit Broderick to state whether he was directly or indirectly influenced to purchase the property by the plaintiff's report. Such a statement by the witness was clearly a statement of a conclusion or opinion, and it was the issue, the very question to be determined by the jury. Stinde v. Besh, 42 Mo. App. 478; Baylor v. Water Co., 39 N. Y. Sup. 1114. City of Baltimore v. War, 27 Atl. 85; Weed v. Morten, 89 Ala. 597; Drew v. Keuffer, 30 N. Y. 733. (3) But the court did, in fact, afterwards permit Broderick to answer that very question, and to state his opinion or conclusion thereon to the jury, and counsel for plaintiff waived his objection thereto and permitted the said answers to go to the jury as evidence. This assignment of error is therefore clearly frivolous and wholly without merit.

BLAND, P. J.—The petition, omitting caption, is as follows:

"Plaintiff states that he is a mining expert and geologist, and that on or about the . . . day of January, 1899, he entered into a contract with defendant by the terms of which defendant employed plaintiff as a mining expert to examine certain mining property belonging to defendant, known as the Mammoth and Scotia Lead Mines Property, located in Jefferson county, Missouri, and to make for defendant a written report on said mining property, and defendant promised and agreed to pay plaintiff for said services the sum of one thousand dollars if defendant should sell said property by the direct or indirect aid of said report.

"That afterwards said contract was reduced to writing, a copy of said written contract being hereto attached, marked 'Exhibit A.'

"Plaintiff further says that he did examine the said mining property before said contract was reduced to writing, and returned to St. Louis and furnished defendant a written report thereon, and that thereafter, on or about the twenty-fourth day of January, said contract was written out and signed by defendant in consideration of said examination and report, and on or about the first day of May, 1899, said defendant sold said mining property by the direct or indirect aid of said report.

"Plaintiff says that he has often requested defendant to pay him said sum of one thousand dollars, so agreed to be paid as aforesaid, for said examination and report, but defendant has failed and refused to pay the same, or any part thereof.

"Wherefore plaintiff prays judgment against said defendant for said sum of one thousand dollars, together with interest thereon at six per cent per annum from said first day of May, 1899."

The answer was a general denial. Trial by jury, issues for plaintiff, and damages assessed at $1,070.50.

After an unavailing motion for a new trial, defendant appealed.

The evidence is that appellant and one Richardson owned a tract of land in Jefferson county, Missouri, upon which were several mines that had been opened and worked; that the owner had given to J. D. Houseman, a promoter, an option on the land, and that Houseman had employed an agent in New York to assist him in making a sale of the property to parties in that city. Pending the negotiations in New York, Houseman approached respondent and told him that a report on the property by a geologist and mine engineer, he thought, would aid him in making the sale to the eastern parties. Appellant agreed to have such a report made and employed the respondent to examine the property and make a report thereon for the purpose of aiding the sale; whereupon respondent and appellant entered into the following contract:

"St. Louis, Jan'y 24, 1899.

"This agreement entered into this twenty-fourth day of January, 1899, by and between M. T. Chestnut, of St. Louis. Missouri, party of the first part, and H. A. Wheeler, of St. Louis, Missouri, party of the second part:

"*Witnesseth*: That whereas the party of the second part has made a report on the Mammoth Mining property in Jefferson county, Missouri, to the party of the first part, therefore, the party of the first part hereby agrees to pay the party of the second part one thousand dollars, conditional on the sale of said property by the party of the first part by the direct or indirect aid of said report.

"M. T. CHESTNUT."

Respondent is an educated and experienced geologist and mining engineer, and was familiar with the lead mines of southeast Missouri. He and appellant visited the property, looked over it and respondent made a report of the location of the property, of the mineral the land had produced, of the mines that had been opened on the premises, and its geological formation, accompanied with a map, which was delivered to appellant and afterwards sent east. The report was received by Houseman's agent in the city of New York and, as far as the evidence shows, was retained by him and is still in his hands.

The prospective trade in the east was never consummated. Houseman was a friend of J. J. Broderick and associated with him in other business, and went to Broderick and induced him to interest himself in the property, and Houseman agreed to divide the profits of the sale of the property if Broderick would pay for putting down some drill-holes on the land. Broderick agreed to furnish two thousand dollars for this purpose. Some drilling was done under this agreement and paid for by Broderick. After this was done, Broderick made a conditional purchase of the land of appellant. The arrangement was this; the owners executed four deeds to Broderick, one for a one-fourth interest, one for a half interest, one for a three-fourths interest, and one for the full fee, and deposited them with a bank in St. Louis in escrow under an agreement that on the payment of ten thousand dollars the deed for one-fourth interest should be delivered to Broderick, and on the payment of another ten thousand dollars the deed for a half interest would be delivered, and on the payment of a like amount for each of the other two deeds, they should be delivered. Broderick completed all the payments and received all the deeds.

These deeds were made to Broderick as trustee. They were so made on Broderick's request, and on

account of an understanding between himself and Houseman, to the effect that Houseman should continue his efforts to sell the land, and if he should succeed in making a sale after paying Broderick the purchase price of forty thousand dollars, with interest thereon, the overplus or profits should be divided between himself and Broderick. The arrangement between appellant and Broderick was made December, 1898, and the final payment was made some time during the following summer.

Respondent learning of the sale demanded one thousand dollars of the appellant on his contract, and stated that on the first demand appellant said the sale was not a certainty as yet, and had not been completed; that afterwards, and on a second demand, appellant stated that he thought one thousand dollars was too much, and proposed to pay respondent for his trouble. Appellant denied this statement and testified that he told respondent that his report had nothing to do with the sale and that he owed him nothing under the contract.

In respect to the main issue; i. e., whether or not respondent's report of the property directly or indirectly aided the sale to Broderick, Broderick testified that he had seen the report and casually read it, but that he paid no attention to it; that it stated nothing that he did not know about the property before he saw the report; that neither at the time he saw the report, nor at the time he purchased the property, was he acquainted with respondent and knew nothing of his ability as an expert geologist and mining engineer. To use his own language, he said:

"What influenced me principally was the amount of ore that was coming out of that mine and it had been producing for many years in a crude way; and I saw those reports. In addition to that, I had Mr. Reed's report, who personally went under ground and

stated to Mr. Lucas; Mr. Reed was superintendent for
Mr. Lucas of a mine that he had out in the county, and
he was very desirous Mr. Lucas should purchase it,
thinking it was exceptionally good property; and even
on the dump was a large amount of mineral that could
be utilized, and it showed that the mine was a good
one, even after so many years, irrespective of the
Mammoth mine, which nobody could see, on account
of the water.   Then another gentleman, who I forgot
to mention this morning, named Mr. Dorsay, came up
from Joplin, and he examined the mine thoroughly in
my interest and he was to manage the mine and he
wrote me a report—to Mr. Houseman and myself—
and, conditioned that he take charge of the mine and
run it for me as though it was his own, why I decided
finally to take the mine.   Then Mr. Houseman was to
exert his utmost efforts to sell the mine during all this
time that I had it, and for that consideration Mr.
Houseman was to receive an interest in the profits of
the mine, and I had nothing to do but furnish the means
to run it up to a certain amount, in all probability.
Now, this man calculated, on the basis of what it had
been doing, that this property would easily have paid
from ten to twenty per cent on a hundred thousand
dollars, and I bought it at a little less than half of it;
and during the first few months that I had it, it did
produce a good deal, I think.   I was trying to pump
out this Mammoth mine.   This gentleman says it can
easily be pumped, and it took from ninety days to four
months to do it, and then I became more or less remiss
in the matter, until finally the thing was burnt down,
and it is now rejuvenated.   The facts are, the actual
produce of the mine is what decided me to buy it, and
none of those reports.   And I have been in so many
mining schemes that I don't give that much [snapping
his fingers] for those reports."

Testifying as to his examination of the report, he stated:

"I gave it such a cursory examination, because it was merely a reiteration of what Mr. Chestnut and Mr. Houseman had told me, that I didn't consider it in my mind of any value to me, and therefore I did not examine it as critically as I would have done provided I had never heard of the property or was going to buy it on anybody's report. Now, that is the only fair and candid statement I can make about his report. I don't wish to do an injustice to the gentleman and yourself, and I must state that it didn't influence me at all."

Counsel for appellant asked Broderick the following question: "Were you influenced either directly or indirectly by Mr. Wheeler's report in purchasing the property?" To which question the witness answered: "No, sir."

Counsel for respondent objected to the question for the reason that "it called for a conclusion of the witness" and asked that the answer to the question be stricken out, which objection was by the court sustained and the answer stricken out, to which ruling, counsel for appellant objected and excepted at the time.

It appears from the bill of exceptions that the court sustained the objection and struck out the answer for the reason that "in the opinion of the court no man can tell what operates on his mind." The wiews of the learned trial judge were further expressed in the following opinion incorporated in the bill of exceptions:

"Our court has held, in Van Sickle v. Brown, in a case of malicious prosecution, upon the authority of a case in 114 Mass., that wherever the motive or intent was a necessary ingredient in a case, the party may testify as to the intent with which he did the act. . . . This is the party who·purchased the property, and he might himself be unable to state the extent to which

the different influences operated upon him in the pur-
chase of the property. He may have had this report
before him, knowing that the author of it was or had
been a state geologist, and that may have been a make-
weight. He may have, under the circumstances in
which he was placed, determined to take the property
and take the chances, regardless of these reports. He
may have been as he stated, largely influenced by the
report of Mr. Reed, whom he did not know personally,
but of whom he knew through others; so that if the
witness is permitted to answer this question, he has
to balance all these things and determine whether this
report which he had before him had any direct or in-
direct influence upon him. Still, it seems to me, as
he is the party who bought the property, that he ought
to be permitted to state, subject to the right of re-
examination, as to whether it had any influence what-
ever—whether it had any influence in inducing him to
buy the property, or whether he bought it from other
considerations. The defendant, of course, if he were
on the stand, would not be permitted to state as a
conclusion of law that he did not sell this property
through this report. He would be required to state
facts. He could not testify to the mental operations
of a third party. The rule *post hoc ergo propter hoc,*
is not a rule of logic. The fact that because a man
had a report, that he furnished the report to him, it
does not follow as a conclusion that he bought the prop-
erty upon that report, or was in any degree influenced
by that report, and that the witness here would not be
permitted to testify that he did not sell the property
for that reason. We are dependent, of course, in this
matter upon the integrity of the witness who is per-
mitted to testify as to what influenced him, not as to
the controlling influence, but as to the effect, and he
may be cross-examined as to that and as to all the
circumstances attending his decision in connection with

this report, and I will permit him to answer the question.''

If it is true as a psychological fact that no man can tell what operates on his mind to influence him in an ordinary and simple business transaction, as this was, then the legal and biblical doctrine that man is a free agent must be false and the notion that man is a concious, sane being is a mistaken one; for if a man is moved by influences of which he is not conscious, then his actions produced by such influences can not be the result of intelligent thought or foresight, and to the act should not be attributed a good, bad, or any intent at all. Nor should he be held legally responsible for his act, if the act is the offspring of influences of which he is unconscious. It is not to be believed for a moment that if Broderick was sane when he made the purchase, and sane when he testified, that he was not able to state and speak truthfully as to whether or not Wheeler's report aided him directly or indirectly in his mental processes in estimating the value of the property and in determining the advisability of making the purchase at forty thousand dollars.

In Van Sickle v. Brown, 68 Mo. 627, the Supreme Court held (the learned circuit judge who tried the case at bar writing the opinion) that a party to a suit may always testify as to the intention with which he did an act when it is material to the issue to determine what the action was.

In State v. Banks, 73 Mo. 592, it was ruled that a defendant in a criminal case may testify as to the intent with which he did the act charged, approvingly citing the Van Sickle case.

The same ruling was made in the City of St. Louis v. Clabby, 88 Mo. 573; State v. Partlow, 90 Mo. loc. cit. 626; and in State v. Nelson, 118 Mo. loc. cit. 126.

In Snow v. Paine, 114 Mass. loc. cit. 526, it was said

that "the knowledge and intent of a witness in the transaction in question was a fact which had a bearing on the issues before the jury and of which he might testify."

So we think that the knowledge of Broderick of the property in question of the influences which operated on his mind to induce him to purchase the property were things within his knowledge and of which he might testify.

But, it is contended by respondent that in other parts of Broderick's testimony, that was stricken out, he did testify that Wheeler's report had no influence on him in making the purchase. It is true, such testimony is found in the transcript; but the court having struck out the answer to the direct question, as to whether or not Broderick was influenced by Wheeler's report, it is altogether probable that the jury felt it to be its duty to follow the ruling of the court and that on their retirement they did not consider this testimony of Broderick. At any rate, the appellant was entitled to the testimony that was stricken out to go to the jury with the approval of the court. The similar testimony that was not stricken out went to the jury under the condemnation of the court and, if considered at all by the jury, it is not probable that it was given that consideration and weight that would have been given to it had it been approved by the court. The ruling of the court in striking out the testimony, we think, was, under the circumstances, prejudicial error, for which the judgment should be reversed.

J. D. Houseman testified as to his connection with the property as follows:

"In the latter part of December, think it was, I took same parties down there for the purpose of selling it, and saw fit to get an option. Mr. Broderick, who was associated with me in the railroad business, having heard of my attempts to sell it, volunteered to aid me,

and I stated that I needed about a thousand or two thousand dollars to drill the property in order to discover ore in virgin land and make it thereby more valuable.   I offered to give him a fifth interest, I think it was, in the profits of the land, if he would put up that amount of money.   He did so.   The sale contemplated at that time did not go through.   That was with some St. Louis parties.   I had been attempting to raise money in New York for railroad purposes, and became acquainted with a man that was in the mining business and related to him what I had here, and he said he could sell it, and I attempted to sell it through him, and failed there.   In the meantime the option was running out, and I requested Mr. Chestnut to put a deed in escrow; that was the only way eastern parties would take hold of mines.   They did not like options.   He did so, and about that time, I presume Mr. Broderick became gradually more interested in the property, and as we were approaching the time that this deed in escrow was expiring, he was induced to go into the purchase of it partly.   He wouldn't take the property as a purchase, but he thought if I could extend the time by getting a part of the option extended, whereby he would not lose the money that he put up, that he would go into it and give me more time to sell it.   Instead of attempting to sell it, it resulted in his ultimately purchasing it, but I never stopped trying to sell it.   I had one or two offers for the property after the part of the purchase money was put up.   The interest that I have in it was contingent.''

Also that he has an interest in the property; that his interest appears when Broderick has all his money back with interest that he is to have one-third of the profits if he sells the land at a profit.

In respect to the purchase of the property he said:

''I never had any occasion to purchase the property directly myself, or indirectly.   I stated that my

position was that of a promoter, and the interest that I obtained in mines was generally my commissions and stock and such things as that. My practical experience has been in Joplin, Missouri, where I did own mines, but they were more like leases than they were fee simples.''

The second instruction given for plaintiff is as follows:

''The court instructs the jury that you are not bound to accept the opinion of Mr. Broderick and Mr. Houseman as conclusive as to whether or not they were in any degree influenced to purchase the said mining property by the said report of plaintiff, but you may give such opinions the weight to which you may deem them entitled under all the facts and circumstances in evidence before you.''

The purchase was not made jointly by Broderick and Houseman, but by Broderick alone. Houseman did not contribute a dollar to the purchase price. His interest, as he stated, was a contingent one to appear after Broderick was reimbursed for the money he had invested in the property with interest thereon. Strictly speaking there was not a joint purchase of the property by Broderick and Houseman, and it was error to couple their names together in the instruction as joint purchasers. Broderick's motive in making the deal was to aid Houseman to make something out of the property and as his friend and business associate he first made a payment on the property in order to keep Houseman's option alive and to give him additional time in which to make a sale to the other parties. Houseman was unable to make such sale and in consequence of this fact Broderick continued to make payments until he finally paid the full purchase price.

The instruction is erroneous in another respect. Broderick testified as a fact that the Wheeler report had no influence on him in making the purchase. The

instruction discredited this fact and reduced its proba-tive force to that of a mere opinion, and then told the jury that they were not bound to take the opinion as conclusive. The instruction practically destroyed the probative force of Broderick's evidence "that he was not influenced by the report in making the purchase," and took away from the jury the right to judge of the weight of this testimony.

I think the sale should be treated as having been made to Broderick (not Broderick and Houseman) on or after May 3, 1899. This was subsequent to the Wheeler report. If the report aided the seller directly or indirectly in making the sale, plaintiff is entitled to recover; if not, he is not so entitled. "Aid or assist is the doing of some act whereby the party is enabled, or it is made easier for him to do the principal act or effect some primary purpose." Wiley v. McRee, 2 N. C. 351. If Broderick's estimate of the value of the property was aided by the report, or if he believed that the report would aid the future sale of the prop-erty (since he purchased with a view of a future sale by Houseman), then it may be fairly said that the report did directly or indirectly aid the sale. If the report was in Broderick's mind at any time when he had the purchase under advisement, or at the time of its consummation and it was regarded by him as a means through which a future sale might be aided to some other party, then it did indirectly influence the sale, regardless of the fact that Broderick may have considered it of no value and of the further fact that he was not directly influenced by the report to make the purchase.

For the errors herein noted, the judgment is re-versed and the cause remanded. *Barclay, J.,* concurs; *Goode, J.,* dissents.